**DISTRICT COURT OF THE UNITED STATES**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:18-cr-311-MOC-DCK-5**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| MARK RAYMOND OMAN, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

   **THIS MATTER** is before the Court on Defendant Mark Oman's Motion for a New Trial under Federal Rule of Criminal Procedure 33. (Doc. No. 384). The Government has responded in opposition to the motion (Doc. No. 386), and Defendant has filed a Reply (Doc. No. 389). The Court held a hearing on the motion on May 12, 2022. Thus, the matter is ripe for disposition.

## I. RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

   On September 19, 2018, Defendant was charged by Indictment with one count of conspiracy to commit wire fraud and mail fraud, in violation of 18 U.S.C. § 1349 (Count 1); nine counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 2-10); one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 11); and nine counts of international money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) (Counts 12-20). (Doc. No. 3).

   On September 23, 2019, co-defendant Cole Parks pled guilty pursuant to a plea and cooperation agreement to conspiracy to commit wire fraud and mail fraud (Count 1); wire fraud (Count 9); and conspiracy to commit money laundering (Count 11). (Doc. No. 107). On

September 2, 2020, Parks was sentenced to a term of imprisonment of fifty-seven (57) months per count of conviction to be served concurrently. (Doc. No. 217). In connection with Parks' sentencing, the Court recommended that the Bureau of Prisons ("BOP") place Parks in a facility as close to his hometown of Long Beach, Washington, as possible, consistent with the needs of the BOP, and allow Parks to participate in any available substance abuse treatment program. (Id.). Likely due to the COVID-19 pandemic, Parks was designated to a facility in McDowell, West Virginia ("FCI McDowell"), where he served his sentence.[1]

Defendant's trial in this matter began on July 7, 2021. On July 9, 2021, the Court granted the Government's motion to dismiss Indictment Counts 2, 4, 5, 12, 14, and 15. (Doc. No. 296). Parks testified against Defendant at trial. The defense cross-examined Parks for multiple hours on the afternoon of July 7, 2021, and into the next trial day of July 8, 2021. On July 14, 2021, the jury found Defendant guilty on fourteen counts, including one count of conspiracy to commit wire fraud and mail fraud, six counts of wire fraud, one count of conspiracy to commit money laundering, and six counts of international money laundering. (Doc. No. 302).

On July 15, 2021, after the conclusion of Defendant's trial, Parks' former attorney contacted Government counsel to suggest that it would be efficient and convenient for the Government to file a Rule 35 motion while Parks was still detained at the Mecklenburg County Jail. Government counsel informed Parks' former attorney that Parks essentially had received full cooperation credit, including for future trial testimony, at the time of sentencing. On July 19, 2021, Parks' former attorney followed up to inquire about any ability to move the Court for a recommendation to transfer Parks to a BOP facility closer to his family. Government counsel

---

[1]  According to the BOP website, Parks was released from BOP custody on September 9, 2022. https://www.bop.gov/inmateloc/

informed Parks' former attorney that the Government supported Parks serving out the remainder of his sentence closer to his family, and although there could be no promises, Government counsel would look into the matter.

On July 30, 2021, Parks filed a pro se Motion for BOP Recommendation, requesting that the Court order the BOP to transfer Parks to a new facility that offers the Residential Drug Abuse Program ("RDAP") and is closer to his home and family in the Pacific Northwest. (Doc. No. 318). On August 2, 2021, Government counsel sent an email to the BOP to express support for Parks serving the remainder of his sentence closer to his family, noting that Parks had provided substantial assistance, including recently testifying at trial, and counsel's support was driven primarily by the fact that Parks has a young son who he was unable to see due to the extreme distance.[2]

On August 18, 2021, the BOP acknowledged Government counsel's outreach of August 2, 2021, and noted that Parks still was in transport back from Charlotte, North Carolina. Parks was returned to FCI McDowell thereafter and was not transferred to another BOP facility at that time.

On August 22, 2021, Parks' wife sent Government counsel a letter (handwritten by Parks and dated July 15, 2021) detailing his account of threats by prison staff and an incident involving a cell phone and cigarettes that were confiscated from Parks' cell, all occurring in May 2021. The letter asserted that Parks had been set up by prison staff and that the cell phone and cigarettes were not his. The Government has submitted a sworn declaration stating that this was the first time Government counsel had heard of the alleged incident. See (Ex. 1, Declaration of

_____

[2] According to Google Maps, the distance between McDowell, West Virginia and Long Beach, Washington is 2,699 miles.

Joshua N. DeBold (hereinafter, "DeBold Declaration"); Ex. 2, Declaration of Della Sentilles (hereinafter, "Sentilles Declaration")). Government counsel forwarded Parks' handwritten letter to the BOP.

On September 12, 2021, Parks submitted a request for compassionate release under the CARES Act to the Warden at FCI McDowell. (Doc. No. 380, Ex. 1). In his request, Parks stated that he has an extensive history of heart problems, including a heart attack in 2006, and that his son has learning disabilities, which places a heavy burden on his wife, who is trying to balance his son's education and her own work. (Id.). Further, Parks noted that with the COVID-19 virus spiking again, he is afraid for his life and the future of his family. (Id.). On September 15, 2021, the Warden denied Parks' request for compassionate release, finding that COVID-19 does not currently warrant early release and Parks' concerns with respect to his prior heart attack and his son with learning disabilities do not meet the criteria under 18 U.S.C. § 3582(c)(1)(A). (Doc. No. 380, Ex. 2).

On September 16, 2021, the Court, responding to Parks' prior motion, reiterated its recommendation to the BOP that Parks be transferred to a facility that provided subtance abuse treatment and was closer to Parks' home and family. (Doc. No. 333).

On November 9, 2021, Parks filed a pro se motion requesting that the Court reduce his sentence, or, in the alternative, allow him to complete the remainder of his sentence in a rehabilitation facility or program of the Court's choosing and at Parks' expense. (Doc. No. 354). In support of his motion, Parks requested that the Court consider his "documented medical history, impacted family ties, and significantly harder than usual experience of incarceration," which includes, inter alia, serving his sentence "under covid restrictions/quarantines" and "acts

4

of staff retaliation." (Id.). On November 18, 2021, the Court ordered the Government to respond to Parks' compassionate release motion. (Doc. No. 359).

The Government requested from the BOP Parks' medical and other records that may be relevant to the claims in his compassionate release motion. On December 7, 2021, the BOP provided various files on Parks. Those included a four-page Disciplinary Hearing Office ("DHO") Report describing a May 14, 2021, incident in which a BOP officer confiscated a cell phone, two cigarettes, and a flash drive from a bunk and secured locker assigned to Parks. (Doc. No. 380, Ex. 3 at 3). Parks appeared before the DHO and "denied the charge," stating that he was "set up." (Id.). According to the report, DHO asked Parks if he had evidence of the set-up, and "he had none other than his verbal statement." (Id.). "DHO explained to Parks that he was the only inmate assigned to the cube and it is his responsibility to ensure the entire cube is clear of any type of contraband." (Id.). DHO gave "greater weight" to the officer's report and evidence presented "over [Parks'] verbal denial." (Id.). As a result, DHO found that Parks violated two BOP regulations and imposed sanctions, including loss of good conduct time, disciplinary segregation, and loss of phone privileges. (Id.).

Meanwhile, between December 2 and December 16, 2021, Parks' mother sent Government counsel multiple correspondence relaying accounts of Parks' experience at FCI McDowell. The correspondence assert that prison staff threatened Parks and set him up (in connection with the cell phone incident); that he had been placed in a Special Housing Unit after disciplinary proceedings and had no access to books or other means to better himself; that he was working many hours each day to get only a few minutes of telephone time to call family; and that he had been told he was being transferred to another BOP facility but later told that was a mistake. Government counsel provided all of the correspondence to the BOP. Government

counsel requested, and the Court granted, additional time for the Government to gather information relating to the matters raised in Parks' mother's correspondence.

Government counsel requested and received additional information from the BOP, including that there was an active BOP transfer order for Parks, issued on December 16, 2021, and a transfer would be carried out in due course. On January 7, 2022, the Government filed a timely response to Parks' compassionate release motion. (Doc. No. 380). The filing included three attachments, one of which is the DHO Report regarding the cell phone and flash drive incident. (See id.).

On January 10, 2022, counsel for Defendant contacted Government counsel by e-mail, asserting concern that information surrounding the cell phone and flash drive incident "was not revealed prior to the trial, as it certainly weighs upon Mr. Parks's credibility as a witness." Counsel for Defendant also expressed concern that the cell phone and flash drive "may have contained more materials that bear on Mr. Parks's credibility as a witness . . . ." Counsel for Defendant made a discovery demand for the cell phone and flash drive (or forensic images of each).

On January 12, 2022, Government counsel responded to Defendant's attorneys. Government counsel stated that they first heard of the BOP incident through a letter drafted by Parks that was sent to the Government on August 22, 2021. Government counsel noted that the Government's discovery obligations extend only to the prosecution team in this case, which does not include the BOP, citing the Fourth Circuit's decision in United States v. Taylor, 942 F.3d 205 (4th Cir. 2019). Government counsel confirmed that the Government had produced, via the third-party discovery database set up for the case, files relating to the incident, and was producing additional BOP records on Parks that were in its possession. Government counsel informed

counsel for Defendant that the cell phone and flash drive at issue have never been in the Government's possession, and the Government did not intend to seek them from the BOP.

Defendant then subsequently filed the pending motion for new trial, arguing that a new trial is warranted based on Parks' disciplinary actions while in BOP custody.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 33 provides that the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). Because a motion for a new trial may challenge, among other things, the weight of the evidence, the district court is not required to view the evidence in a light most favorable to the government and therefore may evaluate the credibility of witnesses. United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir. 1985). However, "[u]nder the applicable legal principles, a trial court 'should exercise its discretion to award a new trial sparingly,' and a jury verdict is not to be overturned except in the rare circumstances when the evidence 'weighs heavily' against it." United States v. Smith, 451 F.3d 209, 216 (4th Cir. 2006) (quoting United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003)). Therefore, a new trial should be granted only when the evidence weighs so heavily against guilt that the jury's verdict amounts to a miscarriage of justice. Arrington, 757 F.2d at 1485; United States v. Shipp, 409 F.2d 33, 36–37 (4th Cir. 1969).

A motion under Rule 33 based on newly discovered evidence must satisfy a five-part test by demonstrating: (1) the evidence is, in fact, newly discovered; (2) the defendant exercised due diligence; (3) the newly discovered evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence probably would result in acquittal at a new trial. United States v. Chavis, 880 F.2d 788, 793 (4th Cir. 1989). To succeed on a Rule 33 motion, a

defendant must establish all five elements. United States v. Fulcher, 250 F.3d 244 (4th Cir. 2001); United States v. Singh, 54 F.3d 1182, 1190 (4th Cir. 1995).

### III. DISCUSSION

Defendant predicates his motion for a new trial on three claims: (1) alleged Brady/Giglio violations relating to Government suppression of material impeachment evidence; (2) alleged false trial testimony by Parks; and (3) an overall inability to use evidence relating to Parks' BOP disciplinary infractions to attack Parks' credibility at trial. For the following reasons, each of his arguments lacks merit, and they do not warrant the extraordinary remedy he seeks.

#### A. The Evidence Submitted at Trial

As an initial matter, the evidence submitted to the jury in this case was substantial and clearly supports the jury's finding that Defendant was guilty on fourteen total counts of conspiracy to commit wire fraud and mail fraud, wire fraud, conspiracy to commit money laundering, and international money laundering. To establish Defendant's guilt beyond a reasonable doubt, the Government called, among other witnesses, (i) co-conspirator Parks, who worked with Defendant in the illegal telemarketing sweepstakes; (ii) Brian Kollmeyer, a representative from Western Union, who confirmed that all global transactions required the recipient of the funds to show government issued identification; (iii) Postal Inspector Mark Heath, who presented documentary evidence that Defendant received victim money in his own name and that connected Defendant to co-conspirators Parks, Paul Andy Stiep, and Manuel Mauro Chavez; (iv) Michael Brumley, a victim turned "bridge," who sent money directly to Defendant; (v) Gavin Parks, the brother of Cole Parks and Defendant's childhood friend, who testified, among other things, that Defendant told Gavin Parks that Defendant did "stupid shit" and he was going to "take his lumps"; and (vi) IRS-CI Special Agent Erik Kost, who presented

financial analysis of Western Union and MoneyGram transfers to Defendant, which connected Defendant to Betty McGehee, another victim witness, and Michael Brumley.

First, Parks testified that he and Defendant were childhood friends and that Defendant moved to Costa Rica in 2014 and lived with Parks. (Trial Tr. at 68). Parks also testified that he and Defendant "operated illegal sweepstakes scams from Costa Rica." (Id. at 69). Parks explained that he told Defendant that he worked in a call center doing "sweepstakes scams" and that Defendant became "more and more persistent in trying to get involved himself." (Id. at 88–89). Eventually, Parks introduced Defendant to Eugenio Lamicq Castro, one of the owners and operators of the illegal call center. (Id. at 90–91). Parks testified that Castro trained Defendant on how to be an opener and that eventually Parks and Defendant, in coordination with Castro, made sweepstakes calls to victims from Parks' and Defendant's shared home in Jaco, Costa Rica. (Id. at 92).

Most notably, Parks testified that Defendant received money in his own name from victims of the scheme through Western Union and MoneyGram. (Id. at 92). One of those victims was Michael Brumley, another witness at trial. Parks explained that he and Defendant used Brumley to receive money from victims in the United States and send the funds to them in Costa Rica. (Id. at 95–96). In addition, Parks testified that Defendant knew that co-conspirators Paul Andy Stiep and Manuel Mauro Chavez worked as bridges for illegal call center. Specifically, Parks testified that he and Defendant used Defendant's Facebook account to look up Stiep and Chavez in an attempt to interfere with Castro. (See id. at 102–03 ("We tried to locate his bridges. At that time[,] it was Manuel Chavez and Paul Stiep.")). Parks further testified that together, he and Defendant called Stiep and told Stiep he was involved in an illegal scam. (Id. at 103).

Next, Brian Kollmeyer, the Head of Global Fraud Monitoring for Western Union, testified that in order for someone to pick up money that was sent via Western Union, the recipient would have to show a government issued photo identification. (Id. at 247). During his testimony, Kollmeyer introduced a summary chart containing a sample of the data retained by Western Union concerning wire transfers. See (Gov't Ex. 47). The chart showed, among other things, that an individual named Mark Raymond Oman had received funds that were sent to Costa Rica through Western Union and that when those funds were picked up in Costa Rica, the recipient had shown a U.S. passport to the Western Union agent. (Id.; see also Trial Tr. at 250–51).

Postal Inspector Mark Heath testified that Defendant received money from victims of the telemarketing scheme. Specifically, Heath testified that he received information from Betty McGehee ("McGehee"), a victim of the scheme, that she had sent money to Costa Rica using Western Union and MoneyGram. (Trial Tr. at 301, 310). In response to the information from McGehee, Heath reviewed data from Western Union and MoneyGram, which confirmed that McGehee had sent numerous wires to Costa Rica, and that one of the recipients was Defendant. (Id. at 310). Heath also determined that McGehee had sent money to Brumley, who, in turn, had also sent money to Parks and Defendant. (Id.). Further, Heath identified that the U.S. passport number that was associated with the Western Union wires sent to Mark Raymond Oman in Costa Rica, see Gov't Ex. 47, belonged to Defendant.[3] See (Gov't Exs. 58 & 90; Trial Tr. at 90). During his testimony, Heath also introduced Facebook records belonging to Defendant. (Id. at 320). The records showed that Defendant was Facebook friends with Parks, Sharon Parks (Cole

_____

[3] Defendant confirmed this was his passport number by introducing a copy of his passport at trial. See (Def. Ex. 43).

Parks' wife) and Gavin Parks (Cole Parks' brother). (Id. at 322; see also Gov't Ex. 84). The Facebook records also showed that a search for Paul Stiep had been conducted on Defendant's Facebook account on May 18, 2015. (Id. at 325; see also Gov't Ex. 42). This corroborated Parks' testimony that he and Defendant had conducted a search on Facebook for Castro's bridges, including Stiep.

Next, Michael Brumley, a victim-bridge, testified that he sent money to "Mark Raymond Oman" as well as Cole Parks. (Trial Tr. 464–65). Brumley explained his involvement in the scheme started when "Jake Stevens," whom Cole Parks testified was his alias, called him and informed him that he had won a prize, but first needed to send in money to claim it. (Id. at 462). Brumley started unknowingly moving money for the call center and testified that he spoke to "Jake Stevens" between 100 and 150 times. (Id. at 467). He testified that sometimes when he called Jake Stevens, another man answered the phone. (Id.). When asked whether that other man had an accent, Brumley responded: "If I remember right neither one of them did. They sounded – they talked the same as I do." (Id.).[4] Brumley also testified that the other man who answered Jake Stevens' phone could tell him what Jake Stevens wanted Brumley to do. (Id.). Brumley testified that it seemed like the other man was working with Jake Stevens. (Id.).

Gavin Parks, the brother of Cole Parks and childhood friend of Defendant, also testified at trial. Gavin Parks testified that he had known Defendant his whole life, that Defendant and Cole Parks were friends, and that Defendant had lived in Costa Rica with Cole Parks. (Trial Tr. at 475).

---

[4] At trial, that Defendant attempted to make the point that the other man who answered Jake Stevens' phone was Castro, but Hamblet Arroyo, a co-conspirator who was born in Costa Rica, testified that Castro has an accent like Arroyo. (Trial Tr. at 485, 527).

Most notably, Gavin Parks testified that in or around August 2019, he attended a kite festival in Long Beach, Washington. (Id. at 476). At the kite festival, Gavin Parks had a conversation with Defendant during which Defendant said: "We were doing stupid shit and I'm going to take my lumps." (Id. at 482). When pressed, Gavin Parks also testified that he had a conversation with his brother Cole Parks about the conversation Gavin Parks had with Defendant. (Id. at 478–79). (After the government played the recorded call of Gavin Parks speaking with his brother Cole Parks to refresh Gavin Parks' recollection, Gavin Parks testified: "I don't recall having it, but obviously I did. I mean, there's a recording of it.").

Finally, IRS-CI Special Agent Erik Kost testified regarding the flow of victim money to Defendant. Kost testified that his analysis of data obtained from Western Union and MoneyGram showed that during the course of the conspiracy, Defendant received at least 29 separate wires in his name from victims of the scheme. The funds were wired from the United States to Costa Rica and totaled approximately $22,360. (Trial Tr. at 634; Gov't Ex. 51). Kost also conducted an analysis of specific transactions involving McGehee and Brumley. According to the analysis, McGehee had sent approximately $47,718 to Brumley and then Brumley forwarded those funds to Costa Rica; in particular, he sent approximately $24,965 directly to either Defendant or Parks. (Trial Tr. at 645–48; Gov't Exs. 48, 49 & 50). Kost also testified that he found additional evidence connecting Defendant with Brumley in Defendant's Facebook account. (Trial Tr. at 648; Gov't Ex. 104). Specifically, Kost introduced records from Defendant's Facebook account, which showed that on June 1 and June 2, 2015, three separate searches for "Michael Brumley" were conducted using Defendant's account. (Id.).

At trial, Defendant also called his own financial summary witness, former FBI Special Agent James Walsh who testified, among other things, that Defendant was a member of the

telemarketing fraud conspiracy and that Defendant received proceeds from the scheme. See, e.g., (Tr. at 714, 730, 732–33; see also Defendant Exs. 34, 38 & 41). Specifically, through Walsh, Defendant introduced evidence confirming that Defendant received $22,360 in his own name, see Defendant Ex. 34; that Defendant and Parks received approximately $129,064 in funds from Brumley, see Defendant Ex. 38; and that Defendant was one of 183 individuals who received money as part of the scheme, see Defendant Exs. 40 & 41.

Here, the evidence at trial clearly shows that Parks was an important witness who testified to the fact Defendant was involved in illegal telemarketing. But Parks was not the only witness, and his testimony was not the only evidence, against Defendant. As explained above, other witnesses offered evidence that Defendant had a knowing role in the conspiracy, and their testimony was corroborated by the financial transactions and records from Defendant's Facebook account. Defendant's own financial summary witness presented analysis that included Defendant in the conspiracy. Notably, that evidence corroborated Parks and provided ample basis for the jury to credit his account of Defendant's involvement in the conspiracy.

The evidence presented at trial against Defendant—both direct and circumstantial—was extensive and credible. Considered in its totality, the evidence supports the jury's verdict, as it does not weigh so heavily against guilt that the jury's verdict amounts to a miscarriage of justice.

**B. Defendant's Brady/Giglio Claim**

Next, as to Defendant's Brady/Giglio claim, to establish a Brady violation, "'the proponent must show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, i.e., prejudice must have ensued; and (3) that the prosecution had materials and failed to disclose them.'" United States v. Taylor, 942 F.3d 205, 225 (4th Cir. 2019) (quoting United States v. Wolf, 860 F.3d 175, 189–90

13

(4th Cir. 2017)). The materiality inquiry focuses on whether disclosure of the evidence would have created a "reasonable probability" of a different result in the case. Id. (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)). Such a reasonable probability is shown where non-disclosure "undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434.

Brady's disclosure requirements extend to "favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles, 514 U.S. at 437. As the Fourth Circuit has recognized, however, the principle that Brady extends to information known only to the police "is not boundless." Taylor, 942 F.3d at 225. Indeed, in Taylor, the Fourth Circuit declined to extend Brady "beyond its scope" by imputing knowledge to prosecutors that is solely within the possession of agents outside of the prosecution team on the case. See id. at 225–26 (collecting Fourth Circuit cases imputing knowledge of government agents "working the same case").

**i. Whether the Prosecution Team Was Obligated to Disclose Information Solely within the BOP's Possession**

First, as noted, controlling Fourth Circuit authority has firmly established that Brady/Giglio obligations extend only to the agents working on the same case. See Taylor, 942 F.3d at 225–26 (prosecutors are not under a "duty . . . to learn of any favorable evidence known by any government agent"). In Taylor, the Fourth Circuit rejected the argument that impeachment information known to ATF agents working on a separate investigation with the same U.S. Attorney's Office could be imputed to the prosecution team. Id. Similarly, courts in other circuits have explicitly rejected the argument that records in the BOP's custody should be imputed to the Government when the BOP played no role in the Government's investigation or prosecution. See United States v. Merlino, 349 F.3d 144, 155 (3d Cir. 2003) (rejecting argument

14

that government was required to obtain recorded calls from BOP under Brady or the Jencks Act when "the BOP was not part of the prosecutorial arm of the federal government as it was not at all involved in either the investigation or the prosecution of the defendants"); United States v. Noel, No. 19-CR-830-2, 2020 WL 12834537, at *4 (S.D.N.Y. June 9, 2020) (rejecting argument that Government must disclose materials in the BOP's custody, finding that the mere fact "the BOP is a component of the Department of Justice . . . is not sufficient to make the BOP an arm of the prosecution"); United States v. Rivera, No. 13-CR-149 KAM, 2015 WL 1540517, at *3 (E.D.N.Y. Apr. 7, 2015) ("[T]he court cannot find that the government is in constructive possession of the materials where, as here, defendant has not presented any evidence suggesting that the BOP was involved in the investigation or prosecution of this case."); United States v. Battle, 264 F. Supp. 2d 1088, 1201–02 (N.D. Ga. 2003) ("Defendant implies that because the BOP employees are connected with the Department of Justice that the prosecution team constructively possessed exculpatory information that could have been within the knowledge of BOP staff.... Even if the Court assumes that some members of the BOP staff did possess favorable information that alone does not impute knowledge to the prosecution team.").

Defendant cites the Ninth Circuit's decision in Carriger and a series of inapposite cases concerning criminal history records, in an attempt to create a duty for the Government to obtain information solely within the possession of the BOP.[5] The Court agrees with the Government

---

[5] In his motion, Defendant also cites to United States v. Auten, 632 F.2d 478 (5th Cir. 1980). Auten concerns the government's failure to disclose prior criminal convictions of a witness, not BOP disciplinary incidents. Id. at 481. Additionally, at the hearing on the motion for new trial, Defendant alerted the Court to a Washington Supreme Court case, In re Mulamba, No. 99403-0, 2022 WL 1256426, at *6 (Wash. Sup. Court Apr. 28, 2022), in which the court stated that the government had a duty under Brady to disclose exculpatory or impeaching jail records to the defense. Aside from the fact that In re Mulamba is not binding precedent on this Court, the court in In re Mulamba found, as this Court finds here, that the Government's duty under Brady did not undermine confidence in the jury's verdict. Id. at 8.

15

that Carriger is both at odds with Fourth Circuit precedent and distinguishable. There, the Ninth Circuit found that the Government had a duty to obtain and disclose Department of Corrections records for a witness, Dunbar, who had been granted immunity in exchange for testifying against the defendant. Carriger, 132 F.3d at 466. The Ninth Circuit stated that the need for disclosure is particularly acute where a witness has been granted immunity from prosecution in exchange for their testimony. Id. at 479. The Ninth Circuit relied on the Supreme Court's decision in Kyles v. Whitley for the proposition that "the prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf." Id. at 279–80 (citing Kyles, 514 U.S. 419, 437 (1995)). But the full statement in Kyles was that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles, 514 U.S. at 437 (emphasis added). As the Government notes, the Fourth Circuit has faithfully applied the full standard articulated in Kyles in declining to extend Brady obligations beyond the prosecution team in the same case. See Taylor, 942 F.3d at 225–26.

Moreover, the facts in Carriger are distinguishable. Dunbar had been given full immunity in exchange for his testimony, and he led police to most of the evidence gathered in the case. Carriger, 132 F.3d at 466. The physical evidence at trial undercut Dunbar's testimony and supported his own guilt for the crime charged. Id. Dunbar was a "career burglar and six-time felon." Id. at 480. According to the Ninth Circuit's opinion, the Department of Corrections files at issue showed Dunbar "had long been known to state authorities as a habitual liar with a sociopathic personality, who had a lengthy history of burglaries, violence, and attempts at pinning his crimes on others." Id. at 466. During habeas proceedings later in the case, Dunbar confessed in open court that he committed the murder and the defendant was innocent. Id.

16

Here, by contrast, Parks was not given immunity to testify against anyone, including Defendant; the other evidence presented at trial corroborated Parks' testimony and independently implicated Defendant; Parks had no prior felony record when he was sentenced in this case; and Parks' BOP disciplinary records show that contraband was found in his cell and he denied that it was his—a far cry from a history of crime, violence, and attempts at pinning crimes on others. Even if Carriger did not contradict controlling Fourth Circuit authority, which it does, it does not apply to the circumstances in this case.

Second, to establish a Brady violation, a defendant must show that the prosecution knew about the evidence at issue at the time of trial and failed to disclose it. See United States v. Jones, 399 F.3d 640, 647 (6th Cir. 2005) (holding that Brady material must exist at the time of trial); United States v. Veras, 51 F.3d 1365, 1375 (7th Cir. 1995) ("[T]he Brady analysis [i]s limited to evidence known at the time of the trial."). The Government asserts that the prosecution team in this case first learned about Parks' BOP disciplinary incident through a letter handwritten by Parks and transmitted to prosecutors by his wife on August 22, 2021, over a month after the jury's verdict in this case. See (Ex. 1, DeBold Declaration, & Ex. 2, Sentilles Declaration). The Government states that it, therefore, did not know about the evidence and fail to disclose it before trial. Defendant has presented nothing to rebut the sworn declarations submitted by Government counsels attesting to this lack of knowledge.

### ii. Defendant's Argument that the Impeachment Evidence at Issue Was Material

Defendant's Brady claim also fails for the independent reason that evidence relating to the BOP disciplinary incident is immaterial and cumulative in light of the impeachment evidence presented at trial. The jury heard an abundance of evidence regarding Parks' credibility as a witness, including from the defense's extensive cross-examination and impeachment of Parks.

17

Parks' cross-examination began on July 7, 2021, and took up much of the afternoon. (Trial Tr. at 111–76). Towards the end of the day, counsel for Defendant expressed concern to the Court that the jury was growing tired, and they still had another hour or so of cross to get in various documents. (Id. at 164). Noting the obvious concern with allowing the defense to spend the evening tweaking its cross-examination based on what it already heard from Parks, the Court initially was not inclined to grant the request. The Court said that it was not going to go "back through another hour of liar, liar, liar . . . [N]ot going to do it." (Id. at 165). "We know he's lied a lot," the Court added. (Id. at 165–66). Counsel for Defendant stated that he was trying to cut out "everything [getting at] he's a liar" because "that point has been made." (Id. at 166). Ultimately, despite worrying "about this one being a marathon cross," the Court allowed cross-examination to continue into the following day. (Id. at 167).

First, the jury was presented with extensive evidence relating to Parks' credibility and motivations for testifying at trial. Defendant's own motion concedes important points that the jury was able to consider in assessing Parks' credibility, including:

• Parks received benefits in connection with entering his plea agreement, including the Government filing a motion to reduce his sentence by 35%, (Doc. No. 384, p. 4);

• In testifying against Defendant, Parks "hoped for a further reduction from the government," id.; and to BOP disciplinary infractions and not crimes; and

• Parks testified that Defendant was in Costa Rica in October 2016 when certain victims were defrauded, and on cross-examination Defendant forced Parks to admit that government records showed Defendant had left Costa Rica earlier in 2016, id.

Defendant's motion omits numerous, additional points established during Parks' cross-examination, including:

18

• Parks received a reduction in his sentence based on cooperating with the Government, including giving the Government "information about other people that they could use to prosecute them," and one person Parks provided information about was Defendant, (Trial Tr. at 113–14);

• Parks has a wife and little boy whom he loves very much; Parks' father was in prison when he was a kid, and Parks did not want that for his son; and Parks wanted to be home with his family, id. at 114–15;

• Shortly after Parks' arrest, he told the Government that he did not know Defendant; id. at 116;

• At the time of Parks' arrest, he was high on marijuana, id. at 117;

• Parks had been convicted and was guilty of fraud, and that is "simply lying to people," id. at 122;

• Parks told victims "bald-faced lies" and "any lie [he] needed to tell to get money out of one person's pocket and into [his] own," id. at 123;

• Parks was willing to lie to victims when all he wanted was money, and now what he wanted is to be with his son, id. at 124;

• Parks "excessive drug use and alcohol abuse over the years" makes it difficult for him to pinpoint dates, id. at 127;

• Parks lied to his friends about how he was making money (in Costa Rica), id. at 134;

• Parks told friends that he had a 22-bedroom mansion in Costa Rica, but in fact that was not his mansion, id. at 137;

• While in Costa Rica, Parks lied to his wife and wife's family about where his money was coming from, id. at 153;

19

• Parks had his wife wire money from her bank account to buy sweepstakes leads without telling her it involved a fraudulent sweepstakes scam, id. at 154;

• Parks continued to misrepresent to his friends how successful he was, including telling Defendant that he had a contract to make pornography for over $100,000 per month, id. at 202; and

• Parks indicated to his mother on a recorded jail call an expectation that after Defendant's trial Parks would be released and go home, id. at 222.

In addition, the Government, in its opening address to the jury, made clear that cooperating witnesses (including Parks) were looking for a benefit, usually a reduction in their prison sentence. (Trial Tr. at 13). The Government also elicited from Parks that he lied multiple times to his own family about not being involved in the fraudulent sweepstakes scam after he was arrested. (Id. at 109). Overall, the jury had abundant information to assess Parks' credibility and additional cross-examination regarding the BOP incident would not have impacted its assessment.

Second, Defendant's claims that Parks "knowingly provided false statements to the BOP official," see Doc. No. 384 at 23, and that Parks "l[ied] to a federal BOP officer," see id. at 25, are unsupported by the actual contents of the DHO report. The DHO report states that DHO gave "greater weight" to the BOP officer's statements and evidence than to Parks' verbal denial. (Doc. No. 380, Ex. 3). Therefore, Defendant would not be able to use the DHO report to demonstrate that Parks lied to BOP officials. Indeed, Defendant's use of the information at trial would be limited to questioning Parks about the BOP incident and his statements in connection with the BOP disciplinary proceeding. FED. R. EVID. 608(b). Defendant could not use the DHO report or other extrinsic evidence to attack Parks' character for truthfulness. Id.

Defendant also infers that Parks' BOP infractions were "crimes" as support for many of his arguments. However, Parks has not been convicted of any new crimes. See, e.g., United States v. Custis, 988 F.2d 1355, 1359 (4th Cir. 1993) (where two police officers who testified at trial were later indicted on perjury charges relating to their testimony in a separate case, stating that the court was "not prepared simply to presume these officers guilty of criminal misconduct" based on the indictments). The fact that the BOP infractions were not crimes further bolsters the finding that the evidence is not material.

Finally, Defendant attempts to argue that the evidence is material because it shows an undisclosed benefit provided to Parks, namely that the Department of Justice did not prosecute Parks for possessing contraband. Defendant's argument suggests that the Department of Justice does in fact prosecute every BOP inmate who is found with an item he or she should not have in prison. If Defendant's suggestion were true, every federal prosecutor in the country would end up devoting their careers to BOP contraband cases. Defendant's argument shows no undisclosed benefit.

For all of these reasons, and weighed against the substantial evidence supporting the jury's verdict, there is no reasonable probability that the BOP disciplinary evidence at issue would change the outcome of the case.

### C. Defendant's Napue False Testimony Claim

Next, as to Defendant's false testimony claim, conviction obtained through false testimony, "known to be such by representatives of the State," violates due process. Napue v. Illinois, 360 U.S. 264, 269 (1959). Such conviction obtained by the "knowing use of perjured testimony . . . must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976).

Thus, to succeed on a so-called <u>Napue</u> false testimony claim, a defendant must show that (1) the testimony at issue was false; (2) the prosecution knew that it was false; and (3) the false testimony was material. <u>See</u> <u>Napue</u>, 360 U.S. at 269; <u>Agurs</u>, 427 U.S. at 103; <u>United States v. Bush</u>, 944 F.3d 189, 198 (4th Cir. 2019).

Here, Defendant fails to demonstrate that Parks' testimony was false, that the Government knew the testimony was false, or materiality. Regarding Parks' testimony that he had accepted responsibility for his role in the conspiracy, Defendant again incorrectly asserts that Parks committed new crimes. Even if Defendant did have evidence of an actual new crime, he fails to cite any case in which a court applied the novel theory that ongoing criminal conduct is so "antithetical to acceptance of responsibility" as to render such a statement false for purposes of <u>Napue</u>. Regarding Parks' testimony that he was required to testify truthfully, the pertinent statements are quite literally true. Defendant's arguments regarding that testimony suffer from the same factual inaccuracies discussed above (claiming the DHO Report shows Parks provided "false statements" to a BOP official). Parks' testimony that he was not hoping for anything but that a further reduction in his sentence "would be nice" is also not false. Defendant's attempt to point to a later request for the Government to intervene in the BOP matter does nothing to show what Parks did or did not hope for during his trial testimony. It simply does not show falsity.

It follows that since Parks' testimony was not false, the Government necessarily did not knowingly present false testimony. In addition, for the same reasons that Defendant's <u>Brady/Giglio</u> claim fails, the Government had no obligation to know about the BOP infractions that Defendant asserts rendered Parks' testimony false. Since Parks' testimony was not false, it necessarily did not have a reasonable likelihood of affecting the jury's judgment. In addition, for

22

the reasons already discussed, the testimony was not material. For all these reasons, Defendant's Napue false testimony argument fails.

### D. Defendant's Claim under Rule 33 Based on Newly Discovered Evidence

Finally, as to Defendant's motion for a new trial based on newly discovered evidence, as noted, a motion under Rule 33 based on newly discovered evidence must satisfy a five-part test by demonstrating: (1) the evidence is, in fact, newly discovered; (2) the defendant exercised due diligence; (3) the newly discovered evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence probably would result in acquittal at a new trial. United States v. Chavis, 880 F.2d 788, 793 (4th Cir. 1989). To succeed on a Rule 33 motion, a defendant must establish all five elements. United States v. Fulcher, 250 F.3d 244 (4th Cir. 2001); United States v. Singh, 54 F.3d 1182, 1190 (4th Cir. 1995).

Defendant's Rule 33 claim based on newly discovered evidence fails to satisfy multiple prongs of the applicable legal test. First, the newly discovered evidence is "merely cumulative [and] impeaching." Fulcher, 250 F.3d at 250. It is cumulative because it adds little to nothing to the impeachment evidence that Defendant used extensively at trial to attack Parks' credibility or motivations for testifying. (Trial Tr. at 111–76); id. at 167 (noting the Court's concern with "marathon" cross); Fulcher, 250 F.3d at 250 (evidence is cumulative if it "adds very little to the probative force of the other evidence in the case so that if it were admitted its contribution to the determination of truth would be out-weighed by its contribution to the length of the trial"). Moreover, as Defendant himself conceded, the BOP disciplinary files are "classic impeachment material." (Doc. No. 384 at 13).

Next, as the Court has thoroughly discussed, in light of the substantial evidence supporting the jury's verdict, the newly discovered evidence was not material. Because the

evidence was not even material, it follows that it would not probably have resulted in an acquittal at a new trial. Overall, the evidence presented at trial against Defendant—both direct and circumstantial—was extensive and credible. Considered in its totality, the evidence supports the jury's verdict. In other words, it does not weigh so heavily against guilt that the jury's verdict amounts to a miscarriage of justice.

### IV. CONCLUSION

For the reasons stated herein, the Court will deny Defendant's motion for a new trial.

## ORDER

**IT IS THEREFORE ORDERED** that Defendant's Motion for a New Trial, (Doc. No. 384), is **DENIED**.

Signed: October 17, 2022

Max O. Cogburn Jr.
United States District Judge

24